**COALITION ON SENSIBLE TRANSPORTATION INC., et al., Plaintiffs,**

**v.**

**Elizabeth DOLE, United States Secretary of Transportation, et al., Defendants.**

**Civ. A. No. 85–2759.**

United States District Court, District of Columbia.

July 24, 1986.

Brian P. Leitch and Bruce Cormier, Washington, D.C., for plaintiffs.

Rebecca Ross, Asst. U.S. Atty., Washington, D.C., for Federal defendants.

David E. Beller, Asst. Atty. Gen., and Louisa Goldstein, Asst. Atty. Gen., State of Md., Baltimore, Md., for State defendants.

Joseph M. Mott, Bethesda, Md., for intervenor City of Gaithersburg.

David R. Podolsky, Asst. City Atty., Rockville, Md., for intervenor Mayor and Council of Rockville.

MEMORANDUM

GASCH, District Judge.

This case is before the Court on the parties' cross-motions for summary judgment and plaintiffs' motion for a preliminary injunction. Plaintiffs are the Coalition on Sensible Transportation, the North Bethesda Congress of Citizens Associations, the Sierra Club, and the Washington Area Bicyclists Association. Defendants are Elizabeth Dole, Secretary of Transportation, and Ray Barnhart, Administrator of the Federal Highway Administration ("FHWA"). Defendant-intervenors are Hal Kassoff, Administrator of the Maryland State Highway Administration ("SHA"), the City of Gaithersburg, Maryland, and the Mayor and Council of Rockville, Maryland.

I. BACKGROUND

At issue in this litigation is a project which would widen Interstate 270 ("I-270"), a highway which runs through Montgomery County, Maryland. I-270 connects Interstate 70 with Interstate 495, the "Beltway" which encircles metropolitan Washington, D.C. The I-270 corridor is a major transportation corridor and is a heavily travelled route for traffic to and from Washington, D.C. as well as communities such as Rockville and Gaithersburg. Substantial economic development along the corridor has caused increased traffic on and around I-270.

A. *Description of the Project*

The I-270 project would widen approximately 16 miles of highway, extending from the I-270 spur ("spur" or "Y-split") near Montrose Avenue north to the intersection with MD 121. Finding of No Significant Impact ("FONSI"), Administrative Record ("A.R.") 357, at I-1. This expansion of I-270 is expected to cost more than $113 million and will take five years to complete. *Id.* (Table 1); A.R. 358.

The I-270 project may be divided into several parts. In the stretch of I-270 running from the I-270 spur to MD 124, the highway would be widened from six lanes to eight "mainline" lanes and four "continuous collector-distributor" ("CC-D") lanes. Two CC-D lanes would be constructed in each direction on this stretch of I-270. FONSI at II-5-6, Plate 2.

The CC-D lanes are designed to separate entering and exiting traffic from the mainline I-270 lanes in order to facilitate the flow of "through" traffic. FONSI at II-5. The CC-D lanes will be separated from the mainline lanes by a barrier that will be periodically interrupted by "slip ramps" that permit access from the CC-D lanes to the mainline lanes, and vice versa. *Id.* The traffic on the CC-D lanes would travel at lower speeds in order to promote safer ingress to and egress from the mainline lanes. *Id.*

From MD 124 to MD 118, a distance of slightly more than three miles, I-270 would be widened from six to eight mainline lanes. FONSI at II-5-6, Plate 3. Finally, from MD 118 to MD 121, I-270 would be widened from four to six lanes. *Id.* No CC-D lanes would be constructed along these stretches of I-270. *Id.* In addition to these widenings of I-270 itself, the project entails modification of the inter-

changes at Montrose Road, Middlebrook Rd./MD 118, and MD 28. FONSI at II-10-15.[1]

### B. Development of the I-270 Project

The possibility of widening I-270 has been under discussion since the early 1970's. See A.R. 9, 10, 11. Consideration of the instant project began in 1979, when the SHA developed a project planning prospectus which addressed conditions in the I-270 corridor from the I-270 spur to MD 121 and discussed proposals for improving traffic flow. See A.R. 32. This document was circulated to various federal and state agencies for comment and review. See A.R. 33, 34, 35. Thereafter a consultant was hired and project planning began in earnest. See A.R. 39, 40, 44, 45.

The administrative record establishes that, between 1980 and 1983, project planners discussed and studied various matters related to construction along I-270, including historic sites, A.R. 58, 64; archeological areas, A.R. 72, 75; environmental conditions, A.R. 73; noise levels, A.R. 69, 276; and air quality, A.R. 197, 199, 199a, 200. Planners also reviewed traffic patterns and forecasts. See A.R. 67, 71, 84, 92, 106, 113, 123, 148, 151, 168, 169. Officials discussed means of improving traffic service and developed alternate proposals that included ramp metering, high occupancy vehicle ("HOV") lanes, widening to eight lanes, and widening to eight lanes with CC-D lanes. See A.R. 63, 76, 77, 80, 81, 95, 139, 153, 173, 185.

On June 11, 1983, the SHA held a public informational meeting on the I-270 project and the alternatives under consideration. A.R. 168, 171. The meeting, held in Montgomery County, was attended by approximately 70 people, who commented on the proposals. A.R. 171. On August 3, 1983,

the I-270 project team decided that the eight-lane, CC-D lane proposal and the no-build alternative would be studied in detail. A.R. 180. Although it presented potentially the worst-case environmental effect, the eight-lane, CC-D lane proposal was deemed the "preferred alternative" because it provided the highest traffic capacity on I-270 and the best service. Id.

By the end of 1983, the SHA had prepared preliminary drafts of an environmental analysis ("EA") and environmental statement required by Section 4(f) of the Department of Transportation Act, which concerns use of parkland in highway construction. See A.R. 193, 205, 208, 208a. This document was sent to the FHWA for comment and, after some revisions, was approved by the FHWA on January 13, 1984. See A.R. 229.

On February 15, 1984, the SHA held a combined location/design public hearing on the I-270 project in Rockville. See A.R. 225, 266. A report prepared in advance of the hearing and mailed to organizations on the SHA mailing list identified the proposals that had been studied and described the eight-lane, CC-D lane plan as the preferred alternative. See A.R. 225. The public hearing was attended by about 280 people, 28 of whom spoke for the record. FONSI at I-3; see A.R. 266, vol. 1.

In response to comments made at the public hearing, three alterations to the preferred alternative were adopted. These alterations involved shifting the roadway south of Montrose Road 24 feet to the west, shifting the roadway south of MD 28 30 feet to the east, and shifting the roadway between MD 28 and the proposed Gude Drive Bridge 43 feet to the west. FONSI at II-7-10. These shifts were made to move the highway farther away

---

**1.** The parties agree that all of the above-noted activity is properly classified as part of the I-270 project. There is a dispute, however, about inclusion of three other highway construction efforts to be undertaken in the I-270 corridor: the I-370 project, which would provide access from I-270 to the Shady Grove subway station; the MD 124 interchange project; and the MD 189 interchange project. Defendants assert that these projects are separate and independent from the widening of I-270; plaintiffs contend that these projects must be considered in conjunction with the I-270 project for purposes of the issues raised in this litigation. This matter will be discussed in Part II A.2.b., infra.

from certain residential areas. *See* A.R. 266, 258, 269.

On April 30, 1984, the FHWA determined that the public hearing requirements established by Section 128 of the Federal-Aid Highway Act had been satisfied. *See* A.R. 297. Thereafter, the SHA submitted the FONSI to the FHWA. A.R. 338. The FHWA concluded that the I–270 project's environmental impact was not significant and approved the SHA's recommendation for a FONSI. A.R. 356, 357. The SHA then issued a public notice announcing that the Department of Transportation had given location and design approval for the I–270 project. A.R. 362.

## C. *Evaluation of Alternative Proposals*

During the administrative consideration of the I–270 project, five alternatives were discussed: the no-build alternative; widening I–270 to eight lanes without CC–D lanes; use of HOV lanes; ramp metering; and widening I–270 to eight lanes with CC–D lanes. *See* FONSI at II–1–10. These proposals and the reasons for their rejection will be briefly discussed.

### 1. *No-Build*

The no-build alternative involved only normal maintenance of I–270 without widening. FONSI at II–1. This alternative was rejected for failure to relieve traffic congestion. *Id.; see also* A.R. 361, at 1. The SHA concluded that, as development in the I–270 corridor intensified, traffic volume on I–270 and other roads in the corridor would increase. Without new construction to alleviate congestion, the SHA found that accident rates would increase and traffic would be diverted to other routes in the corridor, thereby increasing congestion on those routes. FONSI at II–1.

### 2. *Widening to Eight Lanes Without CC–D Lanes*

This proposal would have added a traffic lane in each direction from the I–270 spur to MD 121, so that there would be eight lanes from the I–270 spur to MD 118 and six lanes from MD 118 to MD 121. FONSI at II–2. The SHA rejected this alternate for several reasons. First, existing ramps along I–270 would need to be lengthened, thus requiring "extensive right-of-way acquisitions and relocations resulting in greater overall adverse impact and substantially greater costs." *Id.* Second, bridges passing over I–270 would need to be reconstructed to accommodate the addition of new lanes. *Id.* Third, the alternative would not adequately handle traffic demand in 2010, the "design year" of the I–270 project. *Id.; see also* A.R. 361, at 1.

### 3. *HOV Lanes*

Under this proposal, additional lanes would be constructed and would operate as express lanes or HOV lanes. FONSI at II–3. This alternative was rejected primarily as a result of estimated traffic patterns in the I–270 corridor. *Id.;* A.R. 361, at 1. Projections indicated that a substantial portion of traffic on I–270 was between communities in the corridor and that only a "relatively small percentage of traffic" was destined for the Washington, D.C. central business district. FONSI at II–3. The SHA decided that the express-HOV lanes proposal would not significantly alleviate congestion. *Id.* at II–4. In addition, bridges over I–270 would have to be reconstructed to permit direct access to the express-HOV lanes. *Id.*

### 4. *Ramp Metering*

This alternative called for installation of two-stage traffic lights on entrance ramps to I–270. FONSI at II–4. The metering would attempt to control the flow of vehicles onto I–270 to ensure that traffic would not exceed capacity. *Id.* This proposal was considered in conjunction with the no-build and eight-lane alternates and rejected. *Id.* at II–5. The SHA determined that metering would result in "no net savings in vehicle hours of travel" in the I–270 corridor with metering the eight-lane alternate. *Id.*

### D. *Project Impact on Parklands*

The FONSI includes a Section 4(f) statement that describes the parklands and conservation areas that will be affected by the I-270 project and the steps that will be taken to mitigate harm in those areas. *See* FONSI at VII-1-11. In all, seven parks and conservation areas were examined: Tilden Park, Cabin John Regional Park, Rockmead Park, Wootten Mill Park, Middlebrook Hill Neighborhood Conservation Area, Metropolitan Grove Road Park, and Seneca Creek State Park. The anticipated impact on these areas will be discussed separately.

#### 1. *Tilden Park*

This 79-acre park, operated by the Maryland National Capital Park and Planning Commission ("MNCPPC"), lies east of I-270. FONSI at VII-1-2. As the project was initially planned, 0.1 acre of Tilden Park would have been used for slopes abutting the highway. *Id.* at VII-4. Following the public hearing, however, the location of the I-270 project was shifted, so that no property in Tilden Park will be affected. *Id.*

#### 2. *Cabin John Regional Park*

This 525-acre park, operated by the MNCPPC, is located on both sides of I-270 between the I-270 spur and Montrose Road. FONSI at VII-2. The I-270 project will use more than 7.8 acres of the park in temporary easements to construct slopes abutting the highway. *Id.* at VII-5. While this use could be avoided through construction of a 7,150-foot retaining wall at a cost of $5,461,000, this proposal was rejected as imprudent and infeasible by both the MNCPPC and the SHA. *Id.*

During the pendency of I-270 construction, the MNCPPC will grant temporary easements to permit grading of the 7.8 acres. FONSI at VII-5. Thereafter, eight-foot retaining walls will be constructed in certain areas and the acreage will be landscaped, revegetated, and returned to the MNCPPC for use as parkland. *Id.* The FONSI indicates that the MNCPPC

determined that this approach would be more natural and aesthetically acceptable than construction of a large retaining wall. *Id.*

#### 3. *Rockmead Park*

This 28-acre park lies on the west side of I-270 directly south of the MD 28 interchange. FONSI at VII-2. While use of 1.1 acres of the park was originally contemplated, the SHA elected to avoid any encroachment onto the park through erection of retaining walls. *Id.* at VII-5. Noise barriers also will be provided along park property. *Id.*

#### 4. *Wootten Mill Park*

This 80-acre park, operated by the City of Rockville, lies east of I-270 and south of the MD 28 interchange. FONSI at VII-3. It was originally thought that the project would encroach upon a strip of parkland between Watts Branch Parkway and I-270 and would require permanent acquisition of 0.2 acre of parkland. *Id.* at VII-6. Later engineering studies determined, however, that no parkland need be acquired. *See* Affidavit of Neil J. Pedersen, Director of SHA Office of Planning and Preliminary Engineering, at 7 (May 19, 1986).

#### 5. *Middlebrook Hill Neighborhood Conservation Area*

This parcel of 11.5 acres is owned by the MNCPPC and is located on the east side of I-270 near Seneca Creek State Park. FONSI at VII-3. During I-270 construction, the MNCPPC will grant a temporary construction easement of 0.5 acre. *Id.* at VII-6. After construction is completed, this parcel will be revegetated and will remain under MNCPPC jurisdiction. *Id.*

#### 6. *Metropolitan Grove Road Park*

This 31-acre park is operated by the City of Gaithersburg and lies west of I-270 and north of the MD 124 interchange. FONSI at VII-3. The project requires use of a strip of land 600 feet long and 40 feet wide, a total of 0.2 acre. *Id.* at VII-6. Tempo-

rary construction easements will be acquired for grading; thereafter the acreage will be landscaped and revegetated, and will remain under the jurisdiction of the City of Gaithersburg. *Id.* at VII–7. The City rejected a proposal to avoid any use of parkland through construction of 500–foot retaining walls at a cost of $500,000. *Id.*

### 7. *Seneca Creek State Park*

This 5,127–acre park, operated by the Maryland Forest Service, lies on both sides of I–270 south of Middlebrook Road. FONSI at VII–3. The I–270 project requires use of 2 acres of land in strips varying in width from 10 to 80 feet. *Id.* at VII–7. The Maryland Department of Natural Resources will grant temporary easements for grading, and after construction is completed, the land will be revegetated. *Id.* The Department of Natural Resources rejected an alternative which would have avoided any use of the parkland through construction of a 2,750–foot retaining wall at a cost of $1,650,000. *Id.*

On September 28, 1984, the Director of the Office of Planning and Program Development of the FHWA approved the above-noted uses of Section 4(f) land. A.R. 361. He determined that there were no feasible or prudent alternatives to such uses and that the I–270 proposal included all possible planning to minimize harm to the parklands from such uses. *Id.* at 4.

### E. *Other Effects of the Project*

### 1. *Displacement and Relocation of Individuals*

The FONSI anticipates that the I–270 project construction will displace a total of 11 residences and require relocation of 25 individuals. FONSI at IV–1. All relocations will be accomplished pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Pub.L. No. 91–646. The project will provide a lead time of 18 to 24 months to accomplish these relocations. *Id.* at IV–1–2.

At the MD 28 interchange, seven residences, two of which are already owned by the SHA, will be displaced. FONSI at IV–1. A total of 14 individuals, none of whom are minorities, will be relocated. *Id.* The FONSI notes that these relocations would have been required under any of the build alternatives and would have been desirable for safety reasons even under the no-build alternative. *Id.* A Relocation Assistance Report prepared for the SHA states that there is sufficient housing available to accomplish these relocations. *Id.* at IV–2.

The proposed alternate for the Middlebrook Road interchange would require displacement of three residences and relocation of 10 persons, all of whom are minorities. FONSI at IV–1–2. A study found that there is no adequate housing available within the financial means of these people, so that "housing as a last resort is indicated." *Id.* at IV–2.

The Montrose Road interchange construction will displace one non-minority residence. FONSI at IV–2. Sufficient housing is said to be available for relocation of the owner-occupier of this residence. *Id.*

### 2. *Water Quality*

Construction may cause sedimentation that could adversely affect aquatic species. FONSI at IV–3. The SHA will use erosion and sediment control methods to minimize the impact of this sedimentation upon water quality. *Id.* The SHA also will provide stormwater management facilities to filter out pollutants such as heavy metals and trash that will be discharged from the I–270 right-of-way. *Id.* at IV–3–4.

### 3. *Wetlands*

Three types of wetlands will be affected by the I–270 project. FONSI at IV–4–6. The first type, seasonally flooded basins or flats, will be affected primarily along Watts Branch, due to construction of the MD 28 interchange, and along Gunner Branch, due to construction of the Middlebrook Road interchange. *Id.* at IV–4. In all, approximately six acres of these wetlands will be lost due to widening of the

roadway and grading into the floodplain. *Id.* The FONSI notes that the only alternative to this loss of wetlands is to forgo construction of the MD 28 and Middlebrook Road interchanges. FONSI at IV–4. Other alternatives, such as relocation of streams rather than piping, were rejected. *Id.* at IV–4–5. The FONSI states that a six-acre loss "represents a negligible reduction" in this type of wetland in the project area. *Id.* at IV–4.

The second type of wetland affected is inland fresh meadow. FONSI at IV–5. Half an acre of this type of wetland, about 10 percent of the meadow in the project area, will be lost. *Id.* The FONSI describes this loss as negligible. *Id.* These wetlands are to be replaced at locations to be selected by the Department of Natural Resources. *Id.*

Approximately four acres of inland open fresh water, the third type of wetland, will be lost through sedimentation caused by the construction. FONSI at IV–5. Most of this acreage loss is due to the MD 28 and Middlebrook Road interchange construction. *Id.* The FONSI states that this loss of habitat is negligible, as it amounts to only a small portion of the total amount of inland open fresh water available along streams in the project area. *Id.* at IV–5–6.

The FONSI concludes that there is no practicable alternative to the above-noted loss of wetlands and that the project will employ all practicable methods to minimize harm to wetlands. FONSI at IV–7.

#### 4. *Wildlife Habitat*

The FONSI acknowledges that various terrestrial habitats will be lost due to project construction, with a resulting reduction in wildlife populations inhabiting those areas. FONSI at IV–7. The FONSI states, however, that this loss of wildlife habitat is proportionately negligible. *Id.*

#### 5. *Noise*

Noise levels at 33 noise-sensitive areas along the project were monitored by the SHA. FONSI at IV–8. Fourteen of the 33 areas currently have ambient noise levels higher than the FHWA noise abatement criteria of 70 dBA. *Id.* Under the no-build alternative, predicted noise levels would exceed 70 dBA at 21 of the 33 areas. *Id.* Under the project, predicted noise levels would exceed 70 dBA at 24 areas. *Id.* The FONSI states that noise barriers will be recommended at six locations that represent 13 of the noise sensitive areas. *Id.* The cost of these barriers is estimated at $4 million. *Id.*

#### 6. *Air Quality*

Testing indicates that the project will produce concentrations of carbon monoxide 1–2 parts per million higher than would exist under the no-build alternative. FONSI at IV–8. Under either the project or the no-build alternative, there would be no violations of the National Ambient Air Quality Standards in either 1990 or 2010. *Id.*

### II. DISCUSSION

Plaintiffs allege that three statutes were violated during the consideration and approval of the I–270 project: Section 102(2)(C) of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(C); Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c) (1983 Supp.); and Section 128 of the Federal-Aid Highway Act, 23 U.S.C. § 128 (1982). The Court will consider these arguments in turn.[2]

#### A. *Violation of NEPA*

Plaintiffs assert that defendants violated NEPA in two respects. First, they contend that defendants acted improperly by failing to prepare an environmental impact statement ("EIS") prior to approval of the I–270

---

**2.** The Court notes that defendants question the Washington Area Bicyclists Association's standing to bring this action. Since there is no dispute with respect to the standing of the other plaintiffs, however, the Court need not address the standing of WABA. *See Bowsher v. Synar,* —— U.S. ——, 106 S.Ct. 3181, 92 L.Ed.2d 583 (U.S.1986); *Secretary of Interior v. California,* 464 U.S. 312, 319 n. 3, 104 S.Ct. 656, 660 n. 3, 78 L.Ed.2d 496 (1984).

project. Second, they assert that the EA and FONSI developed by defendants were inadequate as a basis for determining not to prepare an EIS.

### 1. *Statutory Provisions and Standard of Review*

Section 102(2)(C) of NEPA provides that [A]ll agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between the short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C) (1982).

This statute was "designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment." *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772, 103 S.Ct. 1556, 1560, 75 L.Ed.2d 534 (1983). As the Supreme Court has noted, Section 102(2)(C) "serves twin aims":

The first is to inject environmental considerations into the federal agency's decisionmaking process by requiring the agency to prepare an EIS. The second aim is to inform the public that the agency has considered environmental concerns in its decisionmaking process. Through the disclosure of an EIS, the public is made aware that the agency has

taken environmental considerations into account.

*Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 143, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981).

Where, as here, an agency determines that a "major Federal action" will not "significantly affect the quality of the human environment," the agency is required to "explain its finding of no significant impact in a 'concise public document' called an 'environmental assessment.'" *Natural Resources Defense Council v. Herrington*, 768 F.2d 1355, 1430 (D.C.Cir.1985) (quoting 40 C.F.R. §§ 1501.4(a)–(b), 1508.9 (1984)). The EA must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1) (1984). Moreover, the EA must "provide convincing reasons why a ... project with 'arguably' potentially significant environmental impact does not require a detailed impact statement." *Maryland-National Capital Park & Planning Comm'n v. United States Postal Service*, 487 F.2d 1029, 1040 (D.C.Cir.1973).

■ An agency's decision not to prepare an EIS is reviewed under the "arbitrary and capricious" standard. *See Mid-Tex Elec. Co-op., Inc. v. FERC*, 773 F.2d 327, 339 (D.C.Cir.1985). There are four inquiries for the reviewing court:

(1) whether the agency took a 'hard look' at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Id.* (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C.Cir.1983)); *see also Sierra Club v. United States Dept. of Transportation*, 753 F.2d 120, 127 (D.C. Cir.1984). The court's review is strictly limited, however. While the court must "insure that the agency has considered the

environmental consequences[,] it cannot 'interject itself within the discretion of the executive as to the choice of the action to be taken.' " *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (per curiam) (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976)).

### 2. *Failure to Prepare an EIS*

Plaintiffs' first argument is that the I–270 project requires preparation of an EIS. There is no question that the project is a "major Federal action" under NEPA. *See* 40 C.F.R. § 1508.18 (1985) (defining "major Federal action"). The parties do dispute, however, whether the I–270 project will "significantly affect the quality of the human environment." This Court thus must determine whether, upon consideration of the project and any mitigation measures, the defendants have "convincingly established" that the project will have no significant impact. *See Mid-Tex Elec. Co-op., Inc.,* 773 F.2d at 339.

■ In addressing this question, the Court is guided by standards established by the Council on Environmental Quality regulations for implementing NEPA, 40 C.F.R. §§ 1500–1508 (1985) ("CEQ regulations"). These regulations are binding on federal agencies, and their interpretation of NEPA is entitled to substantial deference. *See Andrus v. Sierra Club,* 442 U.S. 347, 357–58, 99 S.Ct. 2335, 2340–41, 60 L.Ed.2d 943 (1979); *Foundation on Economic Trends v. Heckler,* 587 F.Supp. 753, 764 n. 2 (D.D.C.1984), *aff'd in part and vacated in part,* 756 F.2d 143 (D.C.Cir.1985). The CEQ regulations provide that agencies shall determine whether impact is "significant" by considering both the "context" and the "intensity" of the proposed action. 40 C.F.R. § 1508.27 (1985).

Consideration of "context" involves review of an action's short- and long-term effects on "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Where a project is "site-specific," significance "would usually depend upon the effects in the locale rather than in the world as a whole." *Id.*

The "intensity" determination focuses upon the "severity of impact" and involves ten separate factors. *See* 40 C.F.R. § 1508.27(b). The factors relevant to this case include: beneficial and adverse impacts; proximity to wetlands and parklands; whether the effects on the quality of the human environment "are likely to be highly controversial"; whether the project "is related to other actions with individually insignificant but cumulatively significant impacts"; and whether the project "threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment." *Id.* § 1508.-27(b)(1), (3), (4), (7), (10).

#### a. *"Context" of the I–270 Project*

■ Since the I–270 project is "site-specific," this Court must concentrate upon the short- and long-term effects of the project in the "locale" of the project. 40 C.F.R. § 1508.27(a). The scope of review thus is limited to the site of the I–270 project and "its immediate surroundings." *Sierra Club v. Marsh,* 769 F.2d 868, 881 (1st Cir.1985).

■ Plaintiffs identify two short-term effects of the I–270 project. First, they note that project construction will cause disruption of traffic, increased noise, and potential safety problems. The Court finds, however, that these short-term effects are contextually insignificant. Construction of the I–270 project will be "phased" to minimize disruption of traffic, and during peak travel hours the same number of lanes that currently exist on I–270 will remain open to traffic. *See* A.R. 229, at 35; Affidavit of Neil J. Pedersen, Director of the SHA Office of Planning and Preliminary Engineering, at 7 (May 19, 1986). Moreover, mitigation efforts will be undertaken to alleviate noise and safety concerns. *See* FONSI at VIII–34. Second, plaintiffs note that construction will affect approximately 11 acres of parkland along I–270. That acreage, however, represents

only a small fraction of all parkland in the I–270 corridor. Furthermore, that parkland is already significantly affected by its close proximity to the current highway.

In the long-term, the I–270 project will result in displacement of 11 residences, some loss of wetlands and terrestrial habitats, and construction of various storm water facilities, noise barriers, and retaining walls. *See* FONSI at IV–1–8, VII–5. Through provision of relocation assistance, relocation of some wetlands, and adoption of other mitigation measures, however, these effects will be minimized. Moreover, as has been noted previously, project planners have concluded that these effects are proportionately negligible in view of the total residential population and amount of wetlands in the project area. The FONSI and EA reflect that these conclusions were based upon adequate study, and the Court finds that these conclusions were not reached arbitrarily or capriciously.

In addition, the Court notes that this project involves modification of a major existing highway. This factor is clearly relevant to consideration of the "context" of this project. From the administrative record, it is apparent that I–270 already substantially affects the environment in the I–270 corridor; the widening of that highway simply does not constitute an additional substantial effect upon the project "locale" when viewed in that context. *See*

*Hanly v. Kleindienst,* 471 F.2d 823, 831 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

b. *"Intensity" of the I–270 Project*

*Beneficial and Adverse Impacts.* Under 40 C.F.R. § 1508.17(b)(1), project planners are required to consider both "adverse and beneficial" impacts of a project. The "adverse" impacts have been briefly noted above. To these may be added two "beneficial" impacts: improved traffic service on I–270, and increased growth and development in communities along I–270.

The FONSI makes clear that the I–270 project was intended to affect traffic by alleviating serious congestion on I–270 and by reducing the number of congestion-related traffic accidents. *See* FONSI at III–1–3. This purpose is reflected elsewhere in the record. *See* A.R. 361, at 1. To the extent that the project will improve traffic service and reduce accidents, it will have a "beneficial" effect on "the quality of the human environment." [3]

Another beneficial effect of the I–270 project is that it will facilitate economic development in the I–270 corridor. This purpose of the project also is evident from the record. *See* FONSI at I–2; A.R. 361, at 1.

■ The Court notes, however, that *all* highway projects will have some "benefi-

---

**3.** Defendants suggest that traffic and safety considerations may no longer be cognizable under Section 102(2(C) of NEPA in light of the Supreme Court's decision in *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983). There the Court rejected a claim that NEPA required that an EIS consider the psychological harm to individuals that would occur upon permitting the nuclear reactors at Three Mile Island to resume operation. *Id.* 460 U.S. at 779, 103 S.Ct. at 1563. The Court found that an EIS need consider only "effects" that bear "a reasonably close causal relationship" to "a change in the physical environment." *Id.* at 774, 103 S.Ct. at 1561. Since the alleged psychological harm would result only from the "risk" of a nuclear accident, and not from any actual change in the physical environment, it did not need to be discussed in the EIS. *Id.* at 775–79, 103 S.Ct. at 1561–64.

*Metropolitan Edison* clearly does not preclude consideration of the I–270 project's effect on traffic conditions, safety, or community development. In this case, unlike *Metropolitan Edison,* the agency action does involve a "change in the physical environment"—namely, the construction of additional lanes of a highway. Moreover, traffic conditions and community development plainly have a "reasonably close causal relationship" to that change in the physical environment. Thus, *Metropolitan Edison* does not implicitly overrule the many cases which have considered traffic conditions under NEPA. *See, e.g., No East-West Highway Comm., Inc. v. Chandler,* 767 F.2d 21, 25 (1st Cir.1985); *Realty Income Trust v. Eckerd,* 564 F.2d 447, 452 n. 10 (D.C.Cir.1977); *Hanly v. Mitchell,* 460 F.2d 640, 647 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972).

cial" effects upon traffic service and economic growth. There is nothing to suggest that the effects emanating from the I–270 project will be of such magnitude as to differentiate the project from other highway or transportation projects, particularly when the current existence of I–270 is considered. Thus, this "intensity" factor has little weight for purposes of this case.

▪ *Proximity to Parkland and Wetlands.* Another "intensity" factor is a proposed action's proximity to parkland and wetlands. *See* 40 C.F.R. § 1508.27(b)(3). Here the I–270 project is in close proximity with at least seven parks and three categories of wetlands. *See* FONSI at VII–1–7, IV–4–6. Approximately 11 acres of parkland will be directly affected by the project, and 10 acres of wetlands will be lost.

Defendants argue, and the Court agrees, that when mitigation measures are considered, the project's impact upon parkland and wetlands is insignificant. The 11 acres of parkland will be affected only for the pendency of temporary construction easements and thereafter will be graded, reseeded, revegetated, and returned to the jurisdiction of supervising authorities. In addition, some wetlands will be relocated, and mitigation measures will be employed at other wetland areas to minimize harm. *See* FONSI at IV–4–7.

Moreover, the project's impact on parkland and wetlands will be insignificant for other reasons. First, the affected properties constitute only a small fraction of the total amount of parkland and wetlands in the project area. Second, the affected parklands are not actively used at present, and they are already in close proximity with the current I–270 roadbed. *See* FONSI at IV–1–7; *see also Hanly v. Kleindienst,* 471 F.2d at 831.

*Public Controversy.* Plaintiffs assert that the I–270 project is "highly controversial" within the meaning of 40 C.F.R. § 1508.27(b)(4). Defendants contend that this "intensity" factor is not implicated because only a small percentage of all residents in the I–270 corridor participated in the public hearing on the project and no federal, state, or local agencies actively opposed the project.

▪ Courts have interpreted 40 C.F.R. § 1508.27(b)(4) to refer to "instances where 'a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use.'" *Town of Orangetown v. Gorsuch,* 718 F.2d 29, 39 (2d Cir.1983) (quoting *Hanly v. Kleindienst,* 471 F.2d at 830), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 124 (1984); *see also Foundation for North American Wild Sheep v. United States Dep't of Agriculture,* 681 F.2d 1172, 1182 (9th Cir.1982); *Rucker v. Willis,* 484 F.2d 158, 162 (4th Cir.1973). Plaintiffs must produce some evidence of controversy; the mere filing of a suit is not sufficient. *Fund for Animals v. Frizzell,* 530 F.2d 982, 988–89 n. 15 (D.C.Cir.1975) (per curiam); *see also No East-West Highway Comm., Inc. v. Chandler,* 767 F.2d 21, 15 (1st Cir.1985).

In this case, the record of the February 15, 1984 public hearing includes 307 comments from individuals, state and local officials, and civic associations regarding the I–270 project. A review of that record reveals both support for and opposition to the project. *See generally* A.R. 266, vols. 1 & 2. In assessing whether a project is "highly controversial," however, "certainly something more is required besides the fact that some people may be highly agitated." *Fund for Animals,* 530 F.2d at 988–89 n. 15. Nor does the number of critical comments, when considered in light of the residential population of the I–270 corridor, warrant a finding that there is "substantial dispute" about the I–270 project. *See West Houston Air Committee v. Federal Aviation Administration,* 784 F.2d 702, 705 (5th Cir.1986). It also is significant that no "local, state or federal agency charged with environmental responsibility" opposed[4] the I–270 project. *See*

---

**4.** It is noted that the Interior Department recommended the use of retaining walls. *See* FONSI at IX–6.

*West Houston Air Committee,* 784 F.2d at 705.

Plaintiffs assert that a further indicium of public controversy is the I–270 project's apparent facial inconsistency with community and regional master plans which contemplate widening I–270 to eight lanes. *See* A.R. 229, at 49–50. The Court rejects this contention, however. While several courts have concluded that NEPA requires closer scrutiny when a federal project will serve to "override" local zoning protections, *see Maryland-National Capital Park & Planning Comm'n,* 487 F.2d at 1087; *Hanly v. Kleindienst,* 471 F.2d at 831, those holdings are inapplicable to the instant case for two reasons. First, under Maryland law, master plans are not final and binding zoning laws; rather, they are "continually subject to modification in light of actual land use development." *Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 376 A.2d 483, 493 (1977), *cert. denied,* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978). Second, local planning directors charged with interpretation of the relevant master plans have stated

that the I–270 project is consistent with those plans. *See* Affidavit of Jennifer Russel, director of planning for the City of Gaithersburg (May 19, 1986); Affidavit of J. Michael Davis, director of planning for the Mayor and Council of Rockville (May 19, 1986). Thus, the I–270 project will not "override" local zoning protections.

■ The Court's review of the record leads it to find that project planners reasonably concluded that the I–270 project was not "highly controversial." While plaintiffs and others may vigorously oppose the project, that opposition simply is not sufficient under governing case law.

*Cumulative Significance.* Plaintiffs also assert that 40 C.F.R. § 1508.27(b)(7) is implicated by this case because three other highway projects related to the I–270 project are underway in the I–270 corridor.[5] A brief description of the three projects follows.

The first project involves reconstruction and improvement of the I–270 interchange with MD 124 ("MD 124 project"). This project was undertaken to relieve traffic congestion and queueing at the interchange

---

5. Defendants raise two preliminary objections to plaintiffs' claims involving the three related highway projects. First, they assert that litigation of such claims is barred because the claims are "beyond the scope of the complaint." This argument is rejected. The complaint alleges that the defendants did not comply with NEPA or implementing regulations because, *inter alia,* defendants "do not adequately describe related transportation projects." Complaint, Count I, at 17–18. Under the "notice pleading" policy of the Federal Rules of Civil Procedure, that statement is sufficient to permit this Court's consideration of plaintiffs' claims. *See* Fed.R.Civ.P. 8(a)(2); *see also Sinclair v. Kleindienst,* 711 F.2d 291, 293 (D.C.Cir.1983).

Defendants' second contention is that any claims involving the three related highway projects are barred by the doctrine of laches. This claim also is rejected, since the record does not reveal an unreasonable or inexcusable delay that caused undue prejudice to the defendants. *See Save Our Wetlands v. U.S. Army Corps of Engineers,* 549 F.2d 1021, 1026 (D.C.Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *International Fund for Animal Welfare v. Baldrige,* 594 F.Supp. 129, 133 (D.D.C.1984). Defendants assert that there has been an unreasonable delay because the three related highway projects were all approved from four to six years ago. This argument misconstrues plain-

tiffs' claim, however. Plaintiffs do not directly challenge the related projects; rather, they assert that the I–270 project violates NEPA because the CEQ regulations required consideration of the effects of the three related projects in determining whether the I–270 project required an EIS. This claim "arose" when defendants released the I–270 project FONSI in September, 1984; the instant case was filed in August, 1985. A delay of less than one year is not "unreasonable" given the complexity of this case. Moreover, the defendants have suffered no prejudice as a result of the delay, since no contracts on the I–270 project have been let, and defendants have been on notice since the February 15, 1984 public hearing that some individuals believed the I–270 project warranted preparation of an EIS. *See Foundation on Economic Trends v. Heckler,* 587 F.Supp. at 765. Finally, it is settled law that the defense of laches is disfavored in environmental cases because it often may operate to defeat Congress' environmental policy. *See, e.g., Jicarilla Apache Tribe v. Andrus,* 687 F.2d 1324 (10th Cir.1982); *Concerned Citizens on I–190 v. Secretary of Transportation,* 641 F.2d 1 (1st Cir.1981); *Coalition for Canyon Preservation v. Bowers,* 632 F.2d 774 (9th Cir.1980); *Rochester v. U.S. Postal Service,* 541 F.2d 967 (2d Cir.1976).

which resulted in delays along mainline I–270. *See* MD 124 Project FONSI, Supplemental Administrative Record ("S.A.R.") B, at 9. The FONSI for the project was approved by the FHWA on March 6, 1981. *See id.* at 1. The MD 124 project will have the beneficial effects of improving traffic service and reducing congestion-related accidents. *Id.* at 9. The project also would increase noise levels beyond design standards at two sites and require acquisition of more than five acres of commercial property. *Id.* at 7. Measures will be employed to minimize the project's impacts upon more than four acres of floodplain. *Id.* at 14.

The second project involves construction of an interchange in the vicinity of the MD 189/I–270 overpass ("MD 189 project"). The Environmental Assessment for the MD 189 project expressly states that it is related to the I–270 project and is intended to relieve congestion along I–270 by providing an additional means of access from I–270 to the City of Rockville's central business district. *See* S.A.R. G, at 5. A FONSI for the MD 189 project was approved on April 8, 1982. *See* S.A.R. H. The MD 189 project will have the beneficial effects of improving traffic service, reducing congestion-related accidents, and facilitating additional economic development in the central district of the City of Rockville. *See* S.A.R. G, at 5–10. Three residences will be displaced, and two properties which are eligible for the Maryland Historic Site inventory, but which were found not locally significant by a state historic preservation officer, will be acquired. *Id.* at 20, 23. Federal noise level standards will be exceeded at five locations. *Id.* at 29. In addition, the FONSI noted that the MD 189 project was "controversial" and opposed by a number of local residents. *See* S.A.R. H, at 1, V–1–28.

The third project will construct an entirely new interstate highway, I–370 ("I–370 project"). This new highway will extend from I–270, at a point approximately one mile north of the Shady Grove Road interchange, for three miles east to an access road to the Shady Grove Metrorail station.

*See* S.A.R. D, at i. The I–370 project is intended to facilitate the use of the Washington, D.C. area metrorail system and to relieve traffic congestion at the I–270/Shady Grove Road interchange. *Id.* Moreover, the I–370 project encompasses construction of stretches of mainline and CC–D roads on I–270. *See* Affidavit of Neil J. Pedersen, Director of SHA Office of Planning and Preliminary Engineering, at 6–10 (June 2, 1986). An EIS on the I–370 project was approved by the FHWA on August 4, 1982. *See* S.A.R. D.

The I–370 project is intended to have the beneficial impacts of improving traffic conditions, encouraging use of the Metrorail system, and facilitating economic development in Montgomery County. *See* S.A.R. D, at 1–10. The project will displace 30 individuals and a number of businesses. *Id.* at 83, 87–88. The project also will affect to varying degrees regional topography, geology, and water resources. *Id.* at 102–06. Approximately 1200 feet of stream bed will be relocated. *Id.* at 106. In addition, several aquatic and terrestrial habitats will be affected. *Id.* at 111–13. The project will result in noise levels greater than design noise levels at seven locations. *Id.* at 127, 29. Finally, the I–370 project will require permanent acquisition of .07 acre of Muddy Branch Park and .14 acre of Summit Hall Park. *See* S.A.R. F, at 4. Additionally, .25 acre of Muddy Branch Park and .20 acre of Summit Hall Park will be subject to use during the duration of temporary construction easements. *Id.*

■ To invoke 40 C.F.R. § 1508.27(b)(7), a plaintiff must provide some evidence of ongoing or planned related projects. *See No East-West Highway Comm., Inc.*, 767 F.2d at 26. As the above discussion establishes, the MD 124, MD 189, and I–370 projects clearly are "related" to the I–270 project, in that each of the three projects will affect I–270 by reducing congestion and facilitating access.

Initially, it may be argued that while these highway projects are "related" in the

general sense noted above, they may not be "related" within the meaning of 40 C.F.R. § 1508.27(b)(7). Each of the highway projects has a purpose independent of the purpose of the I–270 project, and each project will serve that purpose regardless of whether I–270 is widened. Thus, the determination of whether the effects of these projects and the I–270 project should be aggregated may be found to "require[ ] the weighing of a number of relevant factors, including the extent of interrelationship among proposed actions and practical considerations of feasibility." *Kleppe v. Sierra Club*, 427 U.S. at 412, 96 S.Ct. at 2731. Making such a determination clearly "requires a high level of technical expertise" in the area of traffic analysis and highway engineering and management and thus "is properly left to the informed discretion of the responsible federal agencies." *Id.*

Furthermore, even if the Court did conclude that the impacts of these projects should be aggregated, and that such aggregation would reveal a "cumulatively significant impact," the Court would find that this factor does not mandate preparation of an EIS for the I–270 project.

The obvious purpose of 40 C.F.R. § 1508.27(b)(7) is to require project planners to recognize the cumulative effects of related highway projects and thereby to advance NEPA's goal of encouraging informed public scrutiny of the environmental effects of federal actions. *See Sierra Club v. Marsh*, 769 F.2d at 881; *Conner v. Burford*, 605 F.Supp. 107, 108–09 (D.Mont. 1985). The Court believes that this purpose has been served with respect to the I–270 project.

It is clear from the record that I–270 project planners knew of the "related" projects and apprised the public of the existence of such projects. *See* FONSI at II–10; A.R. 229, at 39. Moreover, as has been discussed, each of the "related" projects was the subject of extensive study and public disclosure in its own right: EAs and FONSIs were prepared for the MD 124 and MD 189 projects, and an EIS was pre-

pared for the I–370 project. In addition, each of the three projects was the subject of a public hearing. Thus, this is not a case where project planners have attempted to minimize public scrutiny by hiding the effects of these projects.

To be sure, project planners could have gathered together in one document a comprehensive description of all impacts arising from these projects. The Court is mindful, however, of the Supreme Court's admonition that a reviewing court may not "impose upon an agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978); *see also Piedmont Heights Civic Club v. Moreland*, 637 F.2d 430, 441 (5th Cir.1981) ("NEPA does not require an agency to restate all of the environmental effects of other projects presently under consideration.").

*Threatened Violation of Environmental Laws.* The final "intensity" factor requires consideration of whether a project threatens a violation of federal, state, or local environmental laws. *See* 40 C.F.R. § 1508.27(b)(10). Here plaintiffs argue that the I–270 project involves Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c), which establishes standards to protect parkland from use in highway projects. As will be discussed *infra*, the Court concludes that the I–270 project did not violate or "threaten" violation of Section 4(f).

c. *Analysis*

 Under the law of this circuit, this Court must determine whether defendants "convincingly established" that the I–270 project will not "significantly affect the quality of the human environment" in order to justify their decision not to prepare an EIS. Here application of the CEQ regulations indicates that defendants have met that burden.

For reasons stated previously the Court believes that the "context" of the I–270 project supports a finding of no significant impact. In addition, only two of the ten "intensity" factors are arguably implicated by the project, and those two factors have little weight under the circumstances of this case. In view of these considerations, and the many mitigation measures which have been incorporated into the project, the Court concludes that I–270 project planners have convincingly justified their decision not to prepare an EIS. Here the defendants "conducted a thorough analysis of the proposed action and imposed specific measures to address the relevant areas of environmental concern." *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 684 (D.C.Cir.1982); *see also Sierra Club v. United States Department of Transportation*, 753 F.2d at 129.

### 3. *Inadequacy of EA and FONSI*

■ Plaintiffs' second argument under NEPA is that the EA and FONSI prepared for the I–270 project were inadequate bases for determining whether an EIS was required. By regulation, an EA is designed to "assist in determining the need for an EIS." 23 C.F.R. § 771.119(a) (1985). The EA therefore must, *inter alia*, define the scope of the proposed project, identify alternatives, and determine which aspects of the project have potential for environmental impact. *Id.* § 771.119(b). Plaintiffs assert that the I–270 EA and FONSI performed none of these functions. Plaintiffs' contentions will be considered.

### a. *Improper Segmentation*

Plaintiffs first argue that the I–270 EA failed to properly define the scope of the project because the I–270 project was improperly "segmented" from the three related highway projects and from the I–270 "spur" or "Y-split."

■ In assessing this claim, the Court is again guided by federal regulations. FHWA regulations require that any FONSI for a highway project "shall evaluate a project which":

(1) Connects logical termini and is of sufficient length to address environmental matters on a broad scope;

(2) Has independent utility or independent significance, i.e., is useable and a reasonable expenditure even if no additional transportation improvements in the area are accomplished;

(3) Will not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f) (1985). These regulations reflect the general rule that NEPA does not permit agencies to avoid review of cumulative effects by dividing projects into components. *See, e.g., Kleppe v. Sierra Club,* 427 U.S. at 410, 96 S.Ct. at 2730; *National Wildlife Federation v. Appalachian Regional Comm'n,* 677 F.2d 883, 890 (D.C.Cir.1981); *Scientists' Institute for Public Information, Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1086–88 (D.C.Cir.1973). Illegal segmentation has been found in a number of highway construction cases. *See, e.g., Swain v. Brinegar,* 542 F.2d 364 (7th Cir.1976) (en banc); *Indian Lookout Alliance v. Volpe,* 484 F.2d 11 (8th Cir.1973); *Named Individual Members of San Antonio Conservation Society v. Texas Highway Dep't,* 446 F.2d 1013 (5th Cir.1971), *cert. denied,* 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972).

*Project Termini and Length.* The I–270 project has its north terminus at MD 121 and its south terminus at the I–270 spur or Y-split and measures sixteen miles. Within that stretch, construction also will occur with respect to the MD 124, MD 189, and I–370 projects. Plaintiffs assert that each of these separate construction projects must be deemed "termini," so that the I–270 project itself will consist of intermittent stretches of highway of varying lengths and with separate termini.

■ The Court rejects this contention. The MD 124 and MD 189 interchange construction projects will not themselves involve any construction along mainline I–270, save for construction of off-ramps and on-ramps at the new MD 189 interchange.

Project planners thus reasonably concluded that the points of construction for the MD 124 and MD 189 projects were not properly deemed termini of the I–270 project.

The I–370 project, on the other hand, will involve substantial construction on I–270, including building of 2.5 miles of mainline and CC–D roads along I–270, a bridge to carry I–270 traffic over I–370, and noise barriers and retaining walls along I–270. This I–370 construction will significantly "interrupt" the I–270 project and thus may constitute a "terminus" for purposes of 23 C.F.R. § 771.111(f)(1). It does not follow, however, that improper segmentation has occurred, since I–270 project planners could reasonably have concluded that the I–370 area was a "logical" terminus. Courts have found that a "major crossroad" is a logical terminus for a highway. *See, e.g., Adler v. Lewis,* 675 F.2d 1085, 1097 (9th Cir.1982); *Swain v. Brinegar,* 542 F.2d at 370. In addition, it appears that significant portions of I–370 construction were in fact included in the I–270 environmental review process. *See* Affidavit of Neil Pedersen, at 7–8 (June 2, 1986). Any "segmentation" of the I–270 and I–370 projects thus did not improperly remove impacts from environmental consideration.

A more pressing concern is whether the southern terminus of the I–270 project— the spur or Y-split—is "logical." As the "Y-split" name implies, this section of highway splits I–270 in two to facilitate access to and from I–495, the Capital Beltway. Each leg of the Y-split currently has four mainline lanes and no CC–D roads.

The Court concludes that project planners reasonably found that the Y-split was a logical terminus. Because the sole function of the Y-split is to channel traffic from the Beltway to mainline I–270, the Y-split may properly be described as a "traffic generator" with respect to I–270. "Traffic generators" are commonly regarded as logical termini for highway projects. *See, e.g., Lange v. Brinegar,* 625 F.2d 812, 815–16 (9th Cir.1980). *Swain v. Brinegar,* 542 F.2d at 370.

■ *Independent Utility or Significance.* The second requirement set by FHWA regulations is that a highway project must have independent utility or significance. *See* 23 C.F.R. § 771.111(f)(2). The previous discussion of the MD 124, MD 189, and I–370 projects reveals that each of those projects has a utility or significance apart from the I–270 project. Similarly, the I–270 project has utility or significance independent of those projects, since the contemplated widening of I–270 will alleviate traffic congestion without regard to the MD 124, MD 189, and I–370 projects. While the projects are related, in that each will affect traffic conditions on I–270, they have independent utility in that each project "can serve its transportation purpose whether or not the other projects are built." *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d at 440.

In addition, the I–270 project has utility and significance independent of any improvement to the Y-split because approximately 45 percent of all traffic on I–270 is "intracorridor" in that it leaves the highway prior to the Y-split. *See* FONSI at Plate 8. Thus, the project has independent utility because it will serve state and local needs. *See Lange v. Brinegar,* 625 F.2d at 815–16.

*Consideration of Other Projects.* The final factor cited in the FHWA regulations is whether a project will "restrict consideration of alternatives for other reasonably foreseeable transportation improvements." 23 C.F.R. § 771.111(f)(3). Plaintiffs argue that improvement of the Y-split is "reasonably foreseeable" and that the widening of I–270 prior to the Y-split will necessarily restrict consideration of alternatives for Y-split improvement. *See Swain v. Brinegar,* 542 F.2d at 370; *Named Individual Members,* 446 F.2d at 1023.

■ The Court rejects this argument. As was noted previously, the Y-split already consists of eight lanes. As such, the eight mainline lanes of a widened I–270 will simply match the capacity of the current Y-split. Moreover, project planners may reasonably have concluded that the addi-

tion of the four CC–D lanes north of the Y-split would not restrict consideration of potential improvements to the Y-split. The purpose of the CC–D roads is to facilitate ingress to and egress from mainline I–270 with respect to interchanges along I–270. Since there is no interchange at the Y-split, continuation of the CC–D roads past the Y-split is not mandated. In addition, defendants note, their traffic analysis indicates that 45 percent of all trips along I–270 terminate prior to the Y-split.

The Court has considered plaintiffs' arguments and has concluded that defendants have complied with the FHWA regulations and have not impermissibly segmented the I–270 project. The administrative record establishes that defendants took a "hard look" at the project and reached reasonable conclusions that have a substantial basis in factual evidence included in the administrative record. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252–53, 76 L.Ed.2d 437 (1983). That is all that NEPA requires.

#### b. *Consideration of Alternatives*

Plaintiffs' second contention as to the adequacy of the EA and FONSI is that they failed to adequately discuss and analyze alternatives to the I–270 project. An examination of the record establishes that this claim has little merit.

As an initial matter, it should be noted that the FHWA regulations require only that an EA "identify" alternatives to a proposed project. *See* 23 C.F.R. § 771.-119(b). The EA on the I–270 project identified five alternatives—no-build, eight lanes, ramp metering, HOV lanes, and the selected project—and discussed the reasons for rejection of the nonselected alternatives. *See* A.R. 229, at 31–38.

■ An agency's consideration of alternatives is reviewed under a "rule of reason"; the agency need only set forth those alternatives sufficient to present a reasoned choice. *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 833–38 (D.C.Cir.1972); *accord, Vermont*

*Yankee Nuclear Power Corp.*, 435 U.S. at 551, 98 S.Ct. at 1215. NEPA is not violated so long as the agency takes a "hard look" at alternatives and explains its reasons for rejecting them. *See Baltimore Gas & Elec. Co.*, 462 U.S. at 97–98, 103 S.Ct. at 2252–53; *Culpeper League for Environmental Protection v. U.S. Nuclear Regulatory Comm'n*, 574 F.2d 633, 634 (D.C. Cir.1978) (per curiam).

■ The I–270 project EA makes clear that the alternatives were rejected for failure to adequately address traffic congestion on I–270. *See* A.R. 229, at 30–37. The administrative record reveals that these conclusions were based on adequate study and analysis of traffic patterns. *See* A.R. 275, 185, 92. The record also reveals that the physical effects of these alternatives were studied. *See* A.R. 173, 168, 104, 73. The record thus establishes that the FHWA took a "hard look" at the alternatives and that its conclusions about traffic congestion and the resulting effect on the "human environment" "have a substantial basis in fact." *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 371–72 (D.C.Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981). The sort of exhaustive analysis urged by plaintiffs, encompassing every conceivable effect of each alternative, simply is not required by NEPA. *See Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 551, 98 S.Ct. at 1215.

#### c. *Failure to Analyze Impacts*

■ Plaintiffs' final argument as to the adequacy of the EA and FONSI is that defendants failed to properly analyze various impacts likely to arise from the I–270 project. With respect to the adequacy of defendants' analysis of impacts on noise levels, water quality, air quality, wildlife habitat, and wetlands, the Court rejects plaintiffs' claims. The FONSI and EA each discuss these impacts in significant detail, and the agency's consideration of those impacts was properly informed by studies included in the administrative

record. *See* A.R. 66, 73, 197, 199, 199a, 200, 276; *see also* A.R. 229, at 20–30, 52–76; FONSI at IV–1–8. Under "rule of reason" review, the Court concludes that the agency took a "hard look" at these likely impacts and that its conclusions had a "substantial basis in fact." *See Izaak Walton League,* 655 F.2d at 371–72; *Culpeper League for Environmental Protection,* 574 F.2d at 634; *Concerned About Trident v. Rumsfeld,* 555 F.2d 817, 827 (D.C.Cir.1976).

Plaintiffs also contend that defendants failed to adequately assess the I–270 project's impact upon the Capital Beltway. The Court disagrees. The FONSI makes clear that planning for improvements to the Beltway are under separate consideration and that those contemplated improvements were factored into the I–270 project. *See* FONSI at I–1–2, VIII–22. Studies of Beltway traffic conditions were made as part of the Beltway project and simply were not repeated in the I–270 administrative record. *See* Affidavit of Neil Pederson, at 3 (June 2, 1986). Consideration of Beltway traffic conditions thus did occur and was sufficient to satisfy NEPA. As one court has noted, so long as a project's "underlying data base included the approved projects and pending proposals, the 'statutory minima' of NEPA has been met." *Piedmont Heights Civic Club,* 637 F.2d at 441.

### B. *Section 4(f)*

Plaintiffs' second challenge to the I–270 project is brought under Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303.[6] The provision relevant to this case provides:

> The Secretary may approve a transportation program or project requiring the use of publicly owned land of a public park, recreation area, or wildlife or waterfowl refuge of national, State, or local significance, or land of an historic site of na-

tional, State, or local significance ... only if—

> (1) there is no prudent and feasible alternative to using that land; and

> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c).

The framework for judicial review under Section 4(f) was established by the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The *Overton Park* Court noted that the determination of an alternative route's "feasibility" under Section 4(f)(1) "admits of little administrative discretion"; an alternative may be rejected as infeasible only if the Secretary can find "that as a matter of sound engineering it would not be feasible to build the highway along any other route." 401 U.S. at 411, 91 S.Ct. at 821. In addition, the "prudency" determination required by Section 4(f)(1) also does not permit a "wide-ranging endeavor" by the Secretary. *Id.* Rather, the Court concluded,

> the very existence of [Section 4(f)] indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from the alternative routes reached extraordinary magnitudes. If the statute[ ] [is] to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems.

*Id.* at 412–13, 91 S.Ct. at 821–22.

The Secretary's Section 4(f) determinations are reviewed under the "arbitrary and capricious" standard, and are "entitled

---

**6.** Section 4(f) was originally codified at 49 U.S.C. § 1653(f). This section was repealed in 1983 as part of an overall recodification of Title 49 and was recodified without substantial change at 49 U.S.C. § 303. *See* Pub.L. No. 97–449 (1983); *see also Druid Hills Civic Ass'n, Inc. v. Federal Highway Admin.,* 772 F.2d 700, 704 n. 1 (11th Cir.1985).

to a presumption of regularity." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. The reviewing court may not "substitute its judgment for that of the agency." *Id.* at 416, 91 S.Ct. at 823. These constraints, however, do not "shield" the Secretary's findings from "a thorough, probing, in-depth review" or preclude a "searching and careful" inquiry into the factual basis for the Secretary's decisions. *Id.* at 415–16, 91 S.Ct. at 823–24.

The first step for a reviewing court is "to decide whether the Secretary acted within the scope of his authority." 401 U.S. at 415, 91 S.Ct. at 823. The court "must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems." *Id.* at 416, 91 S.Ct. at 823. The court then "must consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." *Id.* Finally, the court must consider "whether the Secretary's action followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. at 824.

### 1. *Applicability of Section 4(f)*

In this case it is undisputed that the I–270 project will affect some parklands and recreation areas that fall within the ambit of Section 4(f).[7] Nor does the fact that the I–270 project involves expansion of an existing highway, rather than the construction of an entirely new road-way, remove this case from the scope of Section 4(f). Courts frequently have applied Section 4(f) to proposed expansions of existing highways.[8] The Court believes, however, that no parkland or recreation area property will be "used" for Section 4(f) purposes because the I–270 project will require only temporary construction easements on parkland and recreation areas.

This conclusion is strongly supported by a recent decision of the court of appeals for this circuit. *See Sierra Club v. United States Dep't of Transportation*, 753 F.2d 120 (D.C.Cir.1985). In that case, the Sierra Club brought a Section 4(f) challenge to Federal Aviation Administration ("FAA") orders which amended operations specifications of two airlines. *Id.* at 122. The amended specifications granted the airlines permanent authorization to operate jet airplanes out of Jackson Hole Airport, located within the Grand Teton National Park in Wyoming. *Id.* The court concluded that the FAA action would not involve "use" of protected areas because there would not be "a new and actual use of parkland, or activity on adjoining land that would have a severe physical impact on the parkland." *Id.* at 130. Rather, the FAA action was merely an "insignificant adjustment[ ]" to preexisting use of the airport. *Id.* As such, any increased noise levels resulting from the use of jet aircraft would not constitute a "use" of parkland, and Section 4(f) was thus inapplicable to the FAA action. *Id.* at 122.

---

**7.** The parties do appear to dispute whether there are 70 acres of wildlife habitat in the project area that constitute "publicly owned land ... of national, State, or local significance" under Section 4(f). This type of argument frequently appears in Section 4(f) litigation. *See, e.g., Concerned Citizens on I-190 v. Secretary of Transportation*, 641 F.2d 1 (1st Cir.1981); *Stop H-3 Ass'n v. Coleman*, 533 F.2d 434 (9th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976); *National Wildlife Federation v. Coleman*, 529 F.2d 359 (5th Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976); *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323 (4th Cir.), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); *Pennsylvania Environmental Council, Inc. v. Bartlett*, 454 F.2d 613 (3d Cir.1971). The Court need not resolve this dispute, however, since the parties agree that the I-270 project will affect other areas that are within the scope of Section 4(f).

**8.** *See, e.g., Citizen Advocates for Responsible Expansion, Inc. (I-CARE) v. Dole*, 770 F.2d 423 (5th Cir.1985); *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774 (9th Cir.1980); *Brooks v. Volpe*, 460 F.2d 1193 (9th Cir.1972); *National Wildlife Federation v. Lewis*, 519 F.Supp. 523 (D.Conn.1981), *aff'd*, 677 F.2d 259 (2d Cir.1982). *Cf. Township of Springfield v. Lewis*, 702 F.2d 426 (3d Cir.1983) (§ 4(f) applied to construction of highway that "roughly parallels or replaces" existing highway); *Adler v. Lewis*, 675 F.2d 1085 (9th Cir.1982) (§ 4(f) applied to construction of highway that "generally follows the alignment of the existing highway facility in the corridor").

In this case, a strong argument may be made that the I–270 project's temporary impact upon parkland during the construction period, followed by revegetation and reforestation under the close supervision of park authorities, does not amount to "use" within the meaning of Section 4(f). The Court notes that many courts have stated that "use" should be broadly construed. *See, e.g., Citizen Advocates for Responsible Expansion, Inc. (I–CARE) v. Dole,* 770 F.2d 423 (5th Cir.1985); *Arizona Past & Future Foundation, Inc. v. Lewis,* 722 F.2d 1423 (9th Cir.1983); *Coalition for Responsible Regional Development v. Brinegar,* 518 F.2d 522 (4th Cir.1975). Nevertheless, to constitute "use" an action must "substantially impair the value of the [parkland] site in terms of its prior significance and enjoyment." *Adler v. Lewis,* 675 F.2d 1085, 1092 (9th Cir.1982); *see also I–CARE,* 770 F.2d at 441; *Sierra Club,* 753 F.2d at 130; *Falls Road Impact Committee v. Dole,* 581 F.Supp. 678, 693 (E.D.Wis.), *aff'd,* 737 F.2d 1476 (7th Cir.1984).

■ In this case, the narrow strips of parkland affected by the I–270 project are currently in close proximity to the existing highway and thus are already exposed to noise and visual impairment. *Cf. Sierra Club,* 753 F.2d at 130 ("The land to be used in this case has already been used as an airport for over forty-five years."). In addition, the administrative record establishes that none of the affected parkland is actively used, nor is any such use contemplated by park authorities. *See* FONSI at VII–1– 7. Finally, after construction is completed, the parkland will be returned to its current state through revegetation and reforestation. *Cf. Ashwood Manor Civic Ass'n v. Dole,* 619 F.Supp. 52, 81 (E.D.Pa.), *aff'd,* 779 F.2d 41 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1460, 89 L.Ed.2d 717 (1986); *National Wildlife Federation v. Lewis,* 519 F.Supp. 523, 536 (D.Conn.1981), *aff'd,* 677 F.2d 259 (2d Cir.1982). In view of these circumstances, the Court cannot say that the I–270 project will "substantial-

ly impair the value" of the parkland at issue in this case.

Moreover, the parties have not cited, and the Court's independent research has not uncovered, any cases which have applied Section 4(f) to temporary encroachment upon parkland. Rather, the cases relate to projects that would result in some permanent "loss" of parkland as a result of highway construction. *See, e.g., Overton Park,* 401 U.S. at 412–13, 91 S.Ct. at 821–22. No permanent loss of parkland will occur as a result of the I–270 project.

■ The only permanent effects upon parkland that will result from the I–270 project will be slightly increased noise levels in some areas and potential visual impairment through construction of off-site noise barriers and retaining walls. Plaintiffs assert that these effects should be found to constitute "constructive use" of the parkland. While courts have construed Section 4(f) to encompass "constructive use" of parkland, such "constructive use" will be found only if the offsite activities will have a "severe physical impact" on the parkland, *Sierra Club,* 753 F.2d at 130, or will "substantially impair" its value. *Adler v. Lewis,* 675 F.2d at 1092. In view of the current proximity of the affected parkland to I–270 and the mitigation measures to be employed as part of the I–270 project, the Court concludes that the project will not have a severe physical impact on the parkland and will not substantially impair the value of that parkland.

### 2. *Section 4(f) Analysis*

Even if the I–270 project were found to result in "use" of parkland under Section 4(f), the Court would conclude that Section 4(f) was not violated.

### a. *Section 4(f)(1) Requirements*

Plaintiffs raise two challenges to defendants' compliance with Section 4(f)(1). First, plaintiffs assert that the April, 1984 realignment of the planned I–270 roadway in a manner that would increase use of park-

land by one-half acre[9] violated Section 4(f)(1) because the initial location of the roadway was feasible and prudent. Second, plaintiffs allege that defendants improperly rejected the alternatives to the approved I–270 project as infeasible or imprudent.

Case law has established that, for purposes of Section 4(f)(1), any alternate routes that also "use" parkland do not constitute an "alternative to using that land." *See, e.g., Druid Hills Civic Ass'n v. Federal Highway Administration,* 772 F.2d 700, 715 (11th Cir.1985); *Maryland Wildlife Federation v. Dole,* 747 F.2d 229, 234 (4th Cir.1984); *Louisiana Environmental Society, Inc. v. Coleman,* 537 F.2d 79, 85 (5th Cir.1976); *Citizens to Preserve Wilderness Park v. Adams,* 543 F.Supp. 21, 28 (D.Neb. 1981). When alternate routes do involve "use" of parkland, their consideration by administrative officials is properly tested under the requirements of Section 4(f)(2). *See Maryland Wildlife Federation,* 747 F.2d at 234; *Citizens to Protect Wilderness Park,* 543 F.Supp. at 28.

In this case, the alignment shift challenged by plaintiffs cannot be a violation of Section 4(f)(1), since maintaining the original location of the roadbed would have "used" parkland. This issue therefore must be analyzed under Section 4(f)(2).

Similarly, the administrative record of the I–270 project indicates that all of the "build" alternates to the approved project would have involved some use of Section 4(f) properties. *See* FONSI at VII–1 ("Only the No-Build Alternative fully avoids all taking of parklands.").[10] Accordingly, consideration of the "build" alternates also must be analyzed pursuant to the requirements of Section 4(f)(2). It therefore appears that, strictly speaking, only the rejection of the no-build alternative, alone and in connection with ramp metering, could violate Section 4(f)(1).

As has been noted, the no-build alternative would entail only normal maintenance of I–270, with no widening. The Department of Transportation's Section 4(f) Determination states:

> The No-Build alternate was considered and rejected as being not prudent and feasible since it would not relieve existing or future congestion. Further, traffic congestion on other routes in the area would increase as traffic demand increases beyond the capacity of I–270 as traffic diverts to these other routes.
>
> As congestion increases, motor vehicle accidents with resultant personal injury and property damage would increase. In addition, the No-Build Alternate is not consistent with the Local Master Plans which have designated the I–270 corridor as a major growth area in the county.

A.R. 361, at 1.

The no-build alternative obviously cannot be properly rejected as "infeasible" within the meaning of Section 4(f)(1), since, as a matter of sound engineering, it is clearly possible to maintain an existing highway.[11]

---

**9.** It was initially believed that the shift in the roadbed would result in use of an additional three acres of Cabin John Regional Park. *See* A.R. 292. Project planners later decided to utilize retaining walls along parts of the highway, thereby reducing the amount of additional use of parkland to one-half acre. *See* FONSI at VII–4–5.

**10.** The administrative record indicates the consideration of the I–270 project's effect on parkland began soon after detailed planning of the project commenced. On July 28, 1981, an "environmental inventory," detailing the parkland and recreation areas along the I–270 corridor, was prepared and sent to the Wilson T. Ballard Co., an outside consultant hired to provide planning services on the I–270 project. *See* A.R. 73.

Subsequent documents in the record reflect the finding that any widening of I–270 would encroach upon Section 4(f) properties. *See* A.R. 104; 168. A "Detailed Studies Technical Report" prepared in July, 1983, outlined the effect of the widening alternatives on parkland and described the right-of-way acquisition required for each alternative. *See* A.R. 173 at 6, 19.

**11.** While the Section 4(f) Determination finds that the no-build alternative is "not feasible," that technical error should not be found to amount to a Section 4(f) violation. As one court has noted:

> Though there be technical deficiencies [in the Administrator's § 4(f) determination], "even under the exacting § 4(f) requirements, the judicial branch may not 'fly speck' if it ap-

*See Overton Park,* 401 U.S. at 411, 91 S.Ct. at 821. The Court thus must determine whether the no-build alternative could properly have been rejected as "imprudent."

In a number of Section 4(f) cases, courts have concluded that alternatives may be rejected as imprudent for failure to fulfill the traffic needs of a highway project.[12] This result finds support in the legislative history of Section 4(f). *See* H.R.Rep. No. 1584, 90th Cong., 2d Sess., at 12 (1968) ("In weighing alternatives for highway location, equal consideration must be given to ... whether the established demand for adequate transportation facilities for people, goods, and services will be met.").

The administrative record includes numerous documents discussing traffic conditions in the I–270 corridor. Of particular relevance is an April 10, 1984 study which analyzes traffic patterns in the 2010 design year of the project, based on forecasting of population changes and business development. *See* A.R. 275.[13] That report concludes:

> The No-Build Alternate provides no improvement to areas that already experience forced flow conditions. The duration and frequency of congestion would continue to increase and the roadway (by the design year) from MD 118 to the Y-split would be at or near grid-lock during peak periods.

*Id.* The report's statistical analysis indicated that, for three-and-one-half hours each day, the no-build alternative would result in extreme congestion with frequent traffic stoppages of short and long duration. *Id.* For five hours each day, traffic flow along I–270 would be unstable, with actual stoppages of intermittent duration. *Id.* For six-and-one-half hours each day, traffic flow on I–270 would approach instability, requiring reduced traffic speed. *Id.* Under the no-build alternative, traffic conditions thus would be severely congested from 6 a.m. to 9 p.m. *Id.; see also* A.R. 168, at 19; A.R. 92.

■ In view of these facts, the Court concludes that the no-build alternative was properly rejected as "imprudent." Traffic congestion of the severity, scope, and duration described above may reasonably be believed to involve community disruption of extraordinary magnitudes. *See Arizona Past & Future Foundation,* 722 F.2d at 1428–29 (alternative properly rejected as "imprudent" when it would not provide "the necessary transportation service and relief of traffic congestion in central Phoenix"); *Ashwood Manor Civic Ass'n v. Dole,* 619 F.Supp. at 75 ("The severe congestion on the local roads in question, in conjunction with the stifling effect lack of adequate highway service will have on the local economy, provides sufficient grounds" for finding no-build alternative imprudent).

Since use of the no-build alternative with ramp metering, also would involve no "use" of Section 4(f) parkland,[14] adminis-

---

pears in its review, that all factors and standards were considered."
*Louisiana Environmental Soc'y, Inc. v. Dole,* 707 F.2d 116, 122 (5th Cir.1983) (quoting *Adler v. Lewis,* 675 F.2d at 1095).

**12.** *See, e.g., Druid Hills Civic Ass'n,* 772 F.2d at 715; *Arizona Past & Future Foundation,* 722 F.2d at 1428–29; *Monroe County Conservation Council v. Adams,* 566 F.2d 419, 425 (2d Cir. 1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); *Coalition for Responsible Regional Development v. Coleman,* 555 F.2d 398, 401 (4th Cir.1977); *Louisiana Environmental Soc'y,* 537 F.2d at 85; *Ashwood Manor Civic Ass'n v. Dole,* 619 F.Supp. at 75.

**13.** The forecasting data was taken from a December, 1979 report published by the Metropolitan Washington Council of Governments. *See*

A.R. 36. In July, 1984, a new forecast was issued by the Council of Governments. *See* A.R. 391. The 1984 forecast contains estimates of growth in population, number of households, and employment that are significantly lower than those included in the 1979 forecast. *See* A.R. 391, at iii. Even the 1984 forecast, however, estimates that there will be substantial future growth in each of these areas.

**14.** Ramp metering involves placement of two-phase traffic signals on highway on-ramps several hundred feet in advance of the merge area with the main highway. *See* A.R. 185, at 4. Phasing of the signal permits control of traffic access onto the highway so that traffic flow does not exceed highway capacity. *Id.* Inevitably, vehicle queues form behind the meters, requiring a length of roadway behind the signal for

trative consideration of that alternative also must be evaluated under Section 4(f)(1) standards. Using ramp metering in connection with the no-build alternative was studied in detail by project planners. *See* A.R. 185. That study revealed that, while ramp metering would reduce congestion along I–270 itself, it would not increase the capacity of the highway and thus would result in diversion of substantial amounts of traffic to other routes and thereby increase congestion on those routes. *Id.* The no-build/ramp metering alternative was rejected on this basis. *See* A.R. 361, at 1; A.R. 185, at 2–3; A.R. 229, at 37.

■ The Court concludes that these considerations permitted project planners to reasonably conclude that the no-build/ramp metering alternative was imprudent. The record establishes that this alternative would fail to meet the I–270 project's purpose of increasing roadway capacity and would result in severe disruption throughout the I–270 corridor by increasing congestion on alternate routes. These considerations are sufficient to support a finding of imprudency. *See Druid Hills Civic Ass'n,* 772 F.2d at 715; *Arizona Past & Future Foundation,* 722 F.2d at 1428–29; *Monroe County Conservation Council v. Adams,* 566 F.2d 419, 425 (2d Cir.1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); *Ashwood Manor Civic Ass'n,* 619 F.Supp. at 75.

b. *Section 4(f)(2) Requirements*

■ Courts have interpreted the Section 4(f)(2) requirement of "all possible planning to minimize harm" to parkland to afford more administrative discretion than exists under Section 4(f)(1). While Section 4(f)(1) mandates that the Secretary make a strictly limited, individualized determination of the feasibility and prudency of alternatives, Section 4(f)(2) envisions a balancing process. *See Druid Hills Civic Ass'n,* 772 F.2d at 716–17; *Maryland*

*Wildlife Federation,* 747 F.2d at 234; *Louisiana Environmental Society,* 537 F.2d at 85–86.

Under Section 4(f)(2), the Secretary must "utilize a balancing process that totals the harm caused by each alternative so that an option can be selected which does the least total harm." *Druid Hills Civic Ass'n,* 772 F.2d at 716; *see also Maryland Wildlife Federation,* 747 F.2d at 234. The Secretary is "free to choose among alternatives which cause substantially equal damage to parks." *Druid Hills Civic Ass'n,* 772 F.2d at 716. In addition, the Secretary may reject options which do minimize harm if they are not feasible and prudent. *Id.; see also Adler v. Lewis,* 675 F.2d at 1094.

Several factors do restrain discretionary decisionmaking under Section 4(f)(2), however. The administrative record "must contain adequate information to enable the Secretary to weigh the relative damage to protected properties which would result" from each of the alternates. *Druid Hills Civic Ass'n,* 772 F.2d at 716–17. In addition, the Secretary must engage in meaningful consultation with other planning agencies to coordinate efforts to minimize harm to parkland. *D.C. Federation of Civic Ass'ns v. Volpe,* 459 F.2d 1231, 1239 (D.C.Cir.1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972). The Secretary also may not wholly rely upon representations of state or local officials to take unspecified future actions to minimize harm. *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 700–01 (2d Cir.1972).

Plaintiffs' first challenge under Section 4(f)(2) is to the decision to realign the I–270 roadbed. As a result of that realignment, an additional half acre of Cabin John Regional Park will be "used" through construction easements. *See* A.R. 361, at 2; FONSI at VII–4–5. The Section 4(f) Determination explains:

> nothing to suggest that ramp metering in conjunction with the no-build alternative would require any encroachment onto Section 4(f) property.

queuing. *Id.* The ramp metering study found that, with proper phasing, existing ramps on I–270 would generally provide sufficient queuing space. *Id.* at 6. In any event, there is

In refining the Selected Alternate and its mitigation measures a 24' shift was developed and coordinated with interested officials/citizens. The shift permitted the avoidance of Tilden Park, had minimal increase of impacts to Cabin John Regional Park and provided space to effectively incorporate mitigation measures along the edge of the right of way. With the agreement of the park officials, the 24' shift was incorporated into the Selected Alternate.

A.R. 361, at 2. Plaintiffs argue that the alignment shift violates Section 4(f)(2) because it was initiated in response to citizen complaints and because it increases use of parkland.

It is clear from the administrative record that the realignment was undertaken in response to the concerns of residents of neighborhoods abutting I–270. At the February 15, 1985 public hearing on the I–270 project, numerous citizens complained that the widening of I–270 would increase noise levels in their neighborhoods and create safety problems because of the proximity of the highway to residences. *See* A.R. 266 (vols. 1, 2); *see also* A.R. 258, 269. In response to these concerns, project planners considered shifting the alignment of the roadway. *See* A.R. 276, 281, 292. Use of retaining walls in conjunction with the realignment also was analyzed. *See* A.R. 293. After these studies were completed, and approval of local officials was obtained, the alignment shifts were incorporated into the project. *See* A.R. 294, 302, 303, 315. Federal officials approved the alignment as a "necessary safety measure[ ]." A.R. 363; *see also* A.R. 364.

The Court concludes that Section 4(f)(2) was not violated by the alignment shift. The Secretary had a choice between the original alignment, which would have used property in both Cabin John Regional Park and Tilden Park, and the revised alignment, which would use additional land in Cabin John Regional Park while avoiding any use of parkland in Tilden Park. Because these two alignments evidently would "cause substantially equal damage"

to parkland, the Secretary was free to select between them without violating Section 4(f)(2). *Druid Hills Civic Ass'n*, 772 F.2d at 716. As one court recently noted, "The qualitative weighing of harm to numerous and different types of valued resources is itself difficult, and the relative harm is not likely often to be capable of precise objective measurement." *Maryland Wildlife Federation*, 747 F.2d at 236.

That the alignment shift was made in response to citizen concerns does not make it improper. Congress intended that community preferences be considered under Section 4(f). *See* H. Con. Rep. No. 1799, 90th Cong., 2d Sess., *reprinted in* 1968 U.S. Code Cong. & Ad. News 3482, 3531, 3538; H.R.Rep. No. 1584, 90th Cong., 2d Sess., at 12 (1968); *see also Citizens to Preserve Wilderness Park*, 543 F.Supp. at 34–35. Moreover, these community preferences were motivated by safety concerns, a factor which may properly be considered under Section 4(f). *See Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1452–53 (9th Cir.1984), *cert. denied, Yamasaki v. Stop Ass'n*, —— U.S. ——, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). There is nothing to suggest that the complaining residents were inspired by improper purposes. *Cf. Finish Allatoona's Interstate Right, Inc. v. Brinegar*, 484 F.2d 638, 639 (5th Cir.1973).

The administrative record establishes that the Secretary properly consulted with planning officials to minimize harm to parkland resulting from the realignment. Indeed, the project planners decided to construct retaining walls to minimize encroachment on parkland. *See Ashwood Manor Civic Ass'n*, 619 F.Supp. at 81; *National Wildlife Federation v. Lewis*, 519 F.Supp. at 536. Finally, the studies of the alignment shift prepared by project planners provided the Secretary with an adequate basis for her decision.

Plaintiffs also assert that alternate proposals for improving traffic service along I–270 were improperly rejected. As was noted earlier, the alternates reviewed by project planners included widening I–270 to eight lanes without CC–D lanes, along with

use of ramp metering and express HOV lanes.

The eight-lane alternate was rejected primarily because it would fail to provide adequate traffic service in the design year. *See* A.R. 361, 229; FONSI at II–3. A traffic analysis of the alternates found that widening I–270 to eight lanes

> fails to provide long-term relief to congestion on I–270. Major design year problems associated with this alternate would be the heavy weave between MD 124 and I–270, conflicts with the mainline at interchanges with MD 28, MD 189, and Montrose Road, and the constricted mainline sought of Montrose Road leading to the Y-split divergency. In general, conditions with an 8–lane I–270 would be worse than exists on I–270 today.

A.R. 275, at 1. The traffic analysis established that the eight-lane alternate would result in "gridlock" conditions for ninety minutes each day. *Id.* at 2. For two-and-a-half hours each day, traffic flow along an eight-lane I–270 would be subject to intermittent stoppages. *Id.; see also* A.R. 168, at 19. In short, the eight-lane alternate would not significantly address the problem of severe traffic congestion along I–270 and therefore would fail to meet project goals.

■ Two other reasons for rejection of the eight-lane alternate also appear in the record. First, project planners determined that safety considerations would require extensive lengthening of "merge" lanes to permit adequate room for traffic ingress and egress from mainline lanes. This requirement would necessitate greater right-of-way acquisition, increased dislocations, and significantly higher costs. *See* FONSI at II–2. Second, the "merge" lanes would necessitate reconstruction of I–270 overpass bridges to accommodate a wider highway. *Id.* This bridge reconstruction could

be avoided by construction of collector-distributor (C–D) roads behind existing bridge piers. *Id.* These intermittent C–D roads, however, would create additional "weaving" segments and "merge" areas along I–270 and thus would increase hazardous traffic areas. *Id.* at II–3.

It therefore appears that the eight-lane alternate would result in severe traffic congestion of prolonged duration, require significant right-of-way acquisition with its attendant dislocations and costs, and create additional safety problems. Accordingly, the Secretary reasonably concluded that community disruption of extraordinary magnitudes would occur. As such, the eight-lane alternate was properly rejected as imprudent and thus not suitable for consideration under Section 4(f)(2). *See Adler v. Lewis*, 675 F.2d at 1094; *Louisiana Environmental Society*, 537 F.2d at 86–87.[15]

The eight-lane alternate in conjunction with ramp metering also was rejected for failing to solve traffic problems. *See* A.R. 361. The ramp metering analysis revealed that, under the eight-lane alternate, "there would be an increase in overall vehicle-hours of travel with ramp metering." A.R. 185, at 13. While travel times along I–270 would be slightly reduced, the delays caused by queuing and traffic diversion would result in a 157–hour increase in vehicle hours. *Id.* The Secretary thus reasonably rejected this alternate, which would exacerbate traffic problems, as imprudent under Section 4(f)(2).

The use of HOV lanes in conjunction with the eight-lane alternate also was rejected on traffic congestion grounds. *See* A.R. 361; 229, at 32–34; 341; FONSI at II–3–4. A study prepared for project planners reviewed the effect of HOV lanes using various lane configurations and ve-

---

15. The *Louisiana Environmental Society* court noted:

> Although there is no express feasible and prudent exception to subsection (2), the act clearly implies that one is present. Since the statute allows rejection of a route which completely bypasses the recreational area if it is

> infeasible or imprudent, it is totally reasonable to assume that Congress intended that a route which used the recreational area but had a less adverse impact could be rejected for the same reason.

537 F.2d at 86.

hicle occupancy requirements. *See* A.R. 341. The study revealed that use of HOV lanes in a 3–1–1–3 configuration with two- or three-person vehicle occupancy requirements would still result in severe levels of congestion during peak use hours. *Id.* at 4. In addition, the study found that this configuration would create significant safety problems due to weaving needed to enter and exit HOV lanes. *Id.* at 2.

The HOV study also analyzed 3–2–2–3 and 4–1–1–4 configurations. A.R. 341, at 4. While these configurations provided slight reductions in congestion, they failed to correct congestion problems to any appreciable degree. *Id.* These alternates, by increasing highway width, also would necessitate reconstruction of various I–270 overpasses. *Id.* at 2.

The administrative record thus establishes that use of HOV lanes would not correct severe congestion problems, would create unsafe traffic conditions, and would require complete reconstruction of bridges. These problems permitted planners to reasonably conclude that use of HOV lanes would result in widespread community disruption and would pose unique problems. The Secretary thus properly rejected the HOV alternate as imprudent.

Plaintiffs' final challenge under Section 4(f) contends that project planners failed to utilize all possible planning to minimize harm resulting from selection of the preferred alternate. This argument focuses upon the decision to obtain temporary construction easements rather than to construct retaining walls which would either avoid entirely, or greatly reduce, any use of parkland. Plaintiffs note that the Department of the Interior strongly endorsed use of retaining walls:

As the draft statement points out, … design solutions exist (i.e., retaining walls) to confine construction to the existing right-of-way, thus avoiding or greatly reducing direct use of protected lands. Since the project is located in an area of rapid urban/suburban development, and the need to protect park and recreation resources in such areas is crit-

ical and will increase as development intensifies, we strongly recommend the provision of adequately landscaped retaining walls in response to the second proviso of Section 4(f).

The use of properly designed walls would prevent restrictions that would be placed on recreational planning by fill slopes, and would reduce impairment of the integrity and aesthetic value of the affected parkland. We do not consider the cost of such walls excessive in the context of Section 4(f), nor as a percentage of total project costs. We note that the cost of retaining walls may be reduced somewhat if the need to lengthen culverts under fill slopes is considered.

A.R. 278, at 1; *see also* FONSI at IX–6.

The FONSI includes the following response to the Interior Department's letter:

The Maryland State Highway Administration had coordinated with all agencies with jurisdiction over the parks along I–270 including Maryland National Capital Park and Planning Commission … and Department of Natural Resources. It was agreed that at Wootten Mill Park, Metropolitan Grove and Seneca Creek Park and Middlebrook Conservation Area temporary construction easements would be obtained and the slopes constructed. The various jurisdictions have requested various landscaping treatments which will be incorporated into the design plans. See the various letters from agencies.

\* \* \* \* \* \*

It should be noted that the use of retaining walls to avoid construction easements was discussed with the local park agencies and it was their determinations concurred in by SHA/FHWA that such mitigation was not as prudent as revegetated construction easements. Where retaining walls were considered more prudent, they have been added.

FONSI at IX–12. Basically the same response was made in the Section 4(f) Determination. *See* A.R. 361, at 4.

The Section 4(f) Determination prepared by the Federal Highway Administration cited several reasons for rejecting construction of retaining walls. With respect to Cabin John Regional Park, the determination noted:

> The preferred alternate could not be constructed within the existing 300' right of way without the extensive use of retaining walls along both edges of right of way (est. 6700'). This retaining wall scheme left little opportunity for the incorporation of mitigation measures. Close coordination with the park officials led to the determination that vegetated slopes were preferred to the long and high retaining walls at the edge of the right of way. With the use of temporary easements, the park boundaries and size would be retained and disturbed areas would be regraded, reseeded and reforested to produce a similar edge of the park as exists today. Therefore the use of extensive retaining walls along the park is not a feasible and prudent alternative to the use of temporary slope easements.

A.R. 361, at 2. Use of retaining walls at Metropolitan Grove Road Park and Seneca Creek State Park was rejected for essentially the same reasons. *Id.* at 2–3.

Because the retaining walls proposal would require some "use" of parkland, it must be analyzed under Section 4(f)(2). There is no contention that use of retaining walls is either infeasible or imprudent. The sole question therefore is whether, on the basis of the record, the Secretary had adequate information to weigh the relative effects of the retaining walls proposal versus the temporary easements proposal and could reasonably determine that the temporary easements proposal would result in the least harm to parkland. *See Druid Hills Civic Ass'n,* 772 F.2d at 716; *Maryland Wildlife Federation,* 747 F.2d at 234.

■ The Section 4(f)(2) balancing process permits the Secretary to engage in a broad consideration of the "relative harm" arising from various alternates. *See Maryland Wildlife Federation,* 747 F.2d

at 236. The Secretary may weigh detrimental visual and aesthetic effects against direct physical encroachment upon protected parkland. *Cf. Louisiana Environmental Society, Inc. v. Dole,* 707 F.2d 116, 121–22 (5th Cir.1983) (upholding Section 4(f) rejection of alternate bridge lines because they "will impact passive recreation to a greater extent than the Adopted Line *because of the disruption of views and physical access resulting from their terrestrial alignments.*") (emphasis in original).

■ In this case, project planners considered the views of the Secretary of the Interior and rejected those views in favor of the preferences of the local authorities directly responsible for the affected parkland. This decision does not violate Section 4(f). While the views of the Department of the Interior are entitled to "great weight," that agency does not have a "veto" over Section 4(f) determinations. *See Maryland Wildlife Federation,* 747 F.2d at 235–36. Because the local authorities, and not the Interior Department, were responsible for the parks, I–270 project planners were justified in acceding to the preferences of those local authorities. *Cf. Concerned Citizens of I–190 v. Secretary of Transportation,* 641 F.2d 1, 7 (1st Cir.1981); *National Wildlife Federation v. Coleman,* 529 F.2d 359, 369 (5th Cir.1976); *Pennsylvania Environmental Council v. Bartlett,* 454 F.2d 613, 623 (3d Cir.1971).

### C. *Violation of Section 128(a)*

Plaintiffs' final contention is that defendants violated Section 128(a) of the Federal-Aid Highway Act, 23 U.S.C. § 128(a), in the planning and approval of the I–270 project. That section provides:

> Any State Highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary [of Transportation] that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the econom-

ic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.

The statute reflects congressional intent "that highway planners be directly and publicly confronted with opposing views, to ensure that the planners take close account of the objectives and desires of individual citizens affected by the proposed projects during the planning process." *D.C. Federation of Civic Ass'ns, Inc. v. Volpe*, 434 F.2d 436, 441 (D.C.Cir.1970); *see also I-CARE*, 770 F.2d at 442; *Swain v. Brinegar*, 517 F.2d 766, 772 (7th Cir.1975).

■ Section 128(a) imposes several obligations on highway planners. First, they must carefully consider the social, economic, and environmental effects of the proposed highway. *See National Wildlife Federation v. Snow*, 561 F.2d 227, 233 (D.C.Cir.1976); *City of Davis v. Coleman*, 521 F.2d 661, 679 (9th Cir.1975). Second, they must provide notice that is timely and adequate to acquaint the public with the scope of the proposed project and the method of achieving the project's goals. *I-CARE*, 770 F.2d at 442; *Citizens for Mass Transit Against Freeways v. Brinegar*, 357 F.Supp. 1269, 1276 (D.Ariz.1973). Finally, project planners must give "meaningful" consideration to citizen concerns voiced at the public hearing; the agency may not reach a final decision on highway location or design until after public comments are adequately weighed. *See National Wildlife Federation*, 561 F.2d at 234, 238; *Coalition of Concerned Citizens Against I-670 v. Damian*, 608 F.Supp. 110, 125 (S.D.Ohio 1984).

The role of the reviewing court is to determine whether there has been "substantial compliance" with these requirements. *See Concerned Citizens on I-190*, 641 F.2d at 7; *Coalition on Canyon Preservation v. Bowers*, 632 F.2d 774, 786 (9th Cir.1980); *Joseph v. Adams*, 467 F.Supp. 141, 161 (E.D.Mich.1978). Plaintiffs have the burden of overcoming the "presumption of regularity" of administrative actions. *See Pennsylvania Environmental Council, Inc. v. Bartlett*, 454 F.2d at 619; *Coalition of Concerned Citizens Against I-670*, 608 F.Supp. at 125.

Plaintiffs have raised several challenges that are cognizable under Section 128(a).[16] These contentions will be addressed in turn.

1. *Availability and Accuracy of Project Documents*

Plaintiffs argue that project documents on I-270 were not "readily available" prior to the February 15, 1984 public hearing and that those documents were misleading. Specifically, plaintiffs allege that project documents stated that the selected alternate was consistent with community master plans, a declaration that plaintiffs contend is erroneous.

The administrative record establishes that project planners gave notice of the February 15, 1984 combined location/design public hearing on January 1, 1984. *See* A.R. 225.[17] This notice was accompanied by a brochure which described the proposed project, alternate proposals considered and the reasons for their rejection, and the effects of the selected alternate. *Id.* In addition, the notice stated that the environmental assessment/4(f) document

**16.** One of plaintiffs' arguments is that defendants failed to give notice of a June 11, 1983 "informational meeting" to a number of interested civic groups. The case law clearly establishes, however, that mere "informational meetings" are not cognizable under Section 128(a). *See I-CARE*, 770 F.2d at 443 n. 24; *Arlington Coalition on Transportation*, 458 F.2d at 1338; *Joseph*, 467 F.Supp. at 161. Since such meetings cannot satisfy the requirements of Section 128(a), it necessarily follows that any purported deficiencies in such meetings cannot violate

Section 128(a). Whether defendants "substantially complied" with Section 128(a) must be determined solely on the basis of the public hearing held on February 15, 1984.

**17.** The combined location/design public hearing procedure is outlined in 23 C.F.R. § 771.111(h). This procedure may be utilized in lieu of public hearing procedures specified in 23 C.F.R. § 790.1 *et seq. Id.*

("EA/4(f) document") would be available at various locations in the I–270 corridor. *Id.* This notice was mailed to more than 2,000 residences, businesses, and community organizations, as well as to federal, state, and local agencies. FONSI at VIII–49; A.R. 230. The notice also appeared in four local newspapers and was broadcast over a special AM radio station created to advise commuters of I–270 project planning. FONSI at VIII–49–50.

■ There is nothing in the record to suggest that project documents were unavailable to interested parties; rather, the record supports the conclusion that project planners made extensive efforts to provide relevant information to the public. Moreover, the notice brochure and EA/4(f) document provided extensive discussion of the project's general bounds, its anticipated social, economic, and environmental effects, and the agency's method of achieving project aims. The record therefore establishes that project planners substantially complied with Section 128(a) notice requirements. *See I–CARE,* 770 F.2d at 442; *Citizens for Mass Transit,* 357 F.Supp. at 1276.

■ Plaintiffs' claim that project documents were misleading is spurious. The EA/4(f) statement made available at various locations in the I–270 corridor discusses community master plans and the reasons for determining that the proposed project was consistent with such plans. *See* A.R. 229, at 49–50. Many citizens who spoke at the public hearing questioned the project's consistency with community master plans, thus suggesting that few individuals were "misled" by project documents. *See generally* A.R. 266, vols. 1 & 2; FONSI at VIII–71. Plaintiffs thus have not borne their burden of establishing that Section 128(a) was violated by the alleged inadequacy of documents made available prior to the hearing.

2. *Failure to Give Meaningful Consideration*

■ Plaintiffs also assert that defendants failed to give meaningful considera-

tion to public criticism of the I–270 project. Plaintiffs first contend that the FONSI failed to adequately respond to concerns raised at the hearing. The Court rejects this claim. The FONSI carefully analyzed 307 oral and written comments gleaned from the record of the public hearing and provided 79 pages of point-by-point responses to those comments. *See* FONSI at VIII–1–79. The extent of these responses indicates that project planners recognized and reviewed citizen concerns and substantially complied with the requirement that consideration be given to the concerns. *See Concerned Citizens on I–190,* 641 F.2d at 7; *Swain v. Brinegar,* 517 F.2d at 772; *Fayetteville Area Chamber of Commerce v. Volpe,* 386 F.Supp. 572, 577 (E.D.N.C. 1974), *aff'd,* 515 F.2d 1021 (4th Cir.), *cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140 (1975).

Plaintiffs also challenge the defendants' allowance of a 19–day written comment period as unnecessarily and impermissibly grudging. This claim also is rejected. In view of the advance notice of the hearing provided by project planners, a 19–day period for submission of written comments for inclusion in the public hearing record was not impermissibly short. There is no evidence to suggest that specific criticisms of the project were excluded as a result of the brief comment period; indeed, the hearing record includes numerous written submissions. *See* A.R. 266, vol. 2. Limitation of the comment period therefore did not violate Section 128(a). *Cf. Falls Road Impact Committee, Inc.,* 581 F.Supp. at 698.

■ Finally, plaintiffs allege that project planners violated Section 128 by their decision, made prior to the hearing, to narrow detailed study of project proposals to the no-build alternative and the selected alternate. *See* A.R. 178, 203. In fact, however, a final decision on the project was not made until after the hearing. *See* A.R. 295. The pre-hearing decision to limit study of alternate proposals does not, by itself, violate Section 128(a). As one court noted, "planners are permitted to have a

specific proposal and even to be promoting it. Unless there is a specific proposal to be discussed, it is difficult to see how meaningful public meetings could be held, for there would be no focus." *Coalition of Concerned Citizens Against I–670*, 608 F.Supp. at 125 (citing *Nashvillians Against I–440 v. Lewis*, 524 F.Supp. 962, 987 (M.D.Tenn.1981)). Thus, so long as planners have not improperly "closed their minds" to public criticism, public hearings need not be held "before the systems planning phase is closed." *Id.; see also National Wildlife Federation*, 561 F.2d at 234 (Section 128(a) "says nothing about when a public hearing should take place in relation to the responsibilities the Administrator exercises routinely when no advance acquisitions are proposed.").

Here plaintiffs have failed to provide any support for their contention that project planners had "closed their minds" to public concerns. Indeed, as was noted earlier, public comments at the hearing led planners to examine, and adopt, several realignments of the roadbed location. This fact indicates that planners were responsive to suggestion and criticism. That planners did not adopt all suggestions raised at the hearing obviously does not establish their lack of responsiveness. *See Coalition of Concerned Citizens Against I–670*, 608 F.Supp. at 125–26.

### 3. *Need for Additional Hearing After Alignment Shift*

The alignment shifts made in response to concerns voiced at the public hearing give rise to plaintiffs' next Section 128(a) claim. Plaintiffs assert that the shifts require an additional public hearing. While the question is a close one, the Court rejects this contention.

It is well settled that post-hearing changes in project plans will necessitate a new public hearing only if the changes are "substantial" or "significant." *See* 23 C.F.R. §§ 771.111(h), 790.5; *see also Louisiana Environmental Society, Inc.*, 537 F.2d at 89; *Lathan v. Brinegar*, 506 F.2d 677, 690 (9th Cir.1974) (en banc); *Associa-*

*tion Concerned About Tomorrow, Inc. v. Dole*, 610 F.Supp. 1101, 1118 (N.D.Tex. 1985); *Falls Road Impact Committee, Inc.*, 581 F.Supp. at 698. As one court explained:

[I]f the change is so insubstantial that the public would not be affected any differently than by the original proposal which formed the basis for the first hearing, then the change can be made without the necessity of going through the formality of a new hearing to allow the public the opportunity to express the same views that it did at the previous hearing.

*D.C. Federation of Civic Ass'ns, Inc. v. Volpe*, 316 F.Supp. 754, 779 (D.D.C.1970), *rev'd on other grounds*, 459 F.2d 1231 (D.C.Cir.1971), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972).

The alignment shifts approved in this case would move the I–270 roadbed 24 feet to the west south of Montrose Road, 30 feet to the east south of MD 28, and 43 feet to the west north of MD 28. *See* FONSI at I–7–9. These shifts would increase project costs by approximately $2 million and would move the highway closer to a nursing home, some churches, and an industrial area, while moving the roadbed away from certain residential areas. Noise levels at the affected areas would be increased or decreased slightly. *Id.* Additional land from Cabin John Regional Park would be required, while use of any land from Tilden Park would be avoided. *Id.*

■ The question for the Court is whether the changes in cost, proximity, noise levels, and use of parkland are substantial or significant, so that a second hearing is required under Section 128(a). When considered in the context of the entire project, the Court concludes that the changes do not require an additional hearing. The cost increase is minimal as a percentage of the cost of the entire project. The increase in noise levels is minimal and the nursing home, churches, and industrial area would be only slightly closer to the roadbed. In addition, the shifts will not result in use of a previously unaffected

park. *Cf. Association Concerned About Tomorrow, Inc.*, 610 F.Supp. at 1118.

## III. CONCLUSION

. The Court has carefully reviewed the written and oral arguments advanced by the parties, the lengthy administrative record of the I–270 project, and the case law relevant to the issues presented in this case. The Court concludes that, on the basis of its review, plaintiffs' claims under NEPA, Section 4(f), and Section 128 must be rejected. A searching scrutiny of the record establishes that, contrary to plaintiffs' assertions, the I–270 project planners fully complied with the requirements imposed by these statutes. Because the record in this case provides a more than adequate basis for reaching this conclusion, the Court finds that there are no material facts in dispute and that defendants are entitled to judgment as a matter of law. Accordingly, summary judgment on all counts will be entered for the defendants, and plaintiffs' motions for summary judgment and for a preliminary injunction are denied.